CRESTON GRAIN & LUMBER, INC., Plaintiff,

v.

UNITED STATES of America and Chicago & North Western Railway Company, a Corporation, Defendants.

Civ. No. 01329.

United States District Court
D. Nebraska.

March 9, 1963.

Reuben A. Johnson, Newman Grove, Neb., Alan A. Dusatko, Clarkson, Neb., Warren K. Dalton, Lincoln, Neb., for plaintiffs and intervenors.

Jordan Jay Hillman, Chicago, Ill., R. D. Neely, Omaha, Neb., for defendant Chicago & N. W. Ry. Co.

Robert S. Burk, Washington, D. C., and Theodore L. Richling, Omaha, Neb., for Interstate Commerce Commission and United States.

Before JOHNSEN, Circuit Judge, and ROBINSON and OLIVER, District Judges.

ROBINSON, District Judge.

This is an action to enjoin, set aside and annul the orders of the Interstate Commerce Commission, dated April 25, 1961, and August 23, 1961, in its Finance Docket No. 19411, Chicago & North-western Railway Company—Abandonment—Scribner—Oakdale Line, granting a certificate of public convenience and necessity to the Chicago & North Western Railway permitting abandonment of a line of railroad between Scribner and Newman Grove, Nebraska. The order of April 25, 1961 affirms and adopts the report and the certificate and order recommended by the Hearing Examiner as the report, certificate and order of the Commission, Division 4. The order of August 23, 1961, is by the full Commission denying Protestants' petition for reargument of the Decision and Order of the Commission, Division 4.

The administrative proceedings in this case commenced on July 9, 1956, when Chicago and North Western Railway Company, hereinafter called the Railway Company, filed an application with the Interstate Commerce Commission, hereinafter called the Commission. In its application, the Railway Company requested authorization to abandon a branch line of railroad commonly known as the Scribner to Oakdale branch line, 114.175 miles long, running between the town of Scribner, Nebraska, and Oakdale, Nebraska, through Dodge, Colfax, Platte, Madison, Boone and Antelope Counties, Nebraska. At both the Scribner and Oakdale Termini, the branch line connects with the Railway Company's Fremont-Chadron line.

Protests were filed and a hearing was held February 25, 26, 27, 28 and March 1, 1957 at Albion, Nebraska. A proposed report by a Hearing Examiner, was served on July 10, 1957, in which the position was taken that an abandonment was not warranted at that time, that Protestants should be afforded an opportunity to show whether or not they could support the line under normal conditions, and that the application should be denied.

The applicant filed exceptions to the examiner's proposed report.

Oral argument on the exception to the proposed report was heard on January 23, 1958, at which it was requested by Division 4 of the Commission that the Railway Company submit further data relating to financial results of operating said line of railroad during the

year 1957 and the month of January 1958. It was suggested that a stipulation be reached by the applicant and protestants regarding such data.

On May 21, 1958, an order of the Commission, Division 4, was entered reopening the proceeding for further hearing. Data relating to the financial results of the operation of the line for the calendar year 1957 and the first 6-month period of 1958 was submitted in evidence. Subsequently at the request of the Commission Division 4 and by consent of all parties, applicant filed financial results of operation of the line for the entire year 1958 as late filed exhibits.

On July 6, 1959, the Commission, Division 4, filed and entered a report and order denying the application of the Railway Company to abandon the line of railroad.

On August 10, 1959, the applicant filed a Petition for Reconsideration and Reargument.

On December 18, 1959, the Commission, Division 4, entered an order which states,

"Upon consideration of (1) the record in the above-entitled proceeding; (2) the report and order of division 4, dated July 6, 1959, denying the application therein; (3) the petition of the applicant filed August 10, 1959, for reconsideration of the division's report and order and for argument before the entire Commission; and good cause therefore appearing:

"IT IS ORDERED, that the proceeding be, and it is hereby, reopened for further hearing at a time and place hereafter to be fixed, to receive evidence as to the results of operation of the line involved in the calendar year 1959."

On March 23, 1960, the Commission entered an order referring the proceeding to a hearing examiner. The Commission further ordered that the further hearing was for the purpose of receiving evidence as to the results of operations of the line involved in the calendar year 1959, and that applicant should make available a competent witness or witnesses for examination of all material and relevant facts with respect to such financial results.

On April 28, 1960, the Commission, Division 4, entered an order which stated, in part:

"Upon consideration of * * * (4) the motion of protestants in the proceedings, filed April 22, 1960, for amendment of order for further hearing to permit said protestants to present evidence as to delays in shipments, both to and from the branch line involved, irregularities in service along such branch line, the failure or refusal of the applicant to render services along such branch line and other evidence as to the inadequate and unsatisfactory quality of the service furnished by applicant on such branch line; and

* * * * * *

"It is ordered, that the orders in said proceeding dated December 18, 1959, and March 23, 1960, be, and they are hereby modified to permit protestants the opportunity to present evidence at said further hearing, relative to the matters set forth in the above-described motion, and said motion to that extent be, and it is hereby granted."

On May 2, and May 3, 1960, a hearing was had.

The report of the Hearing Examiner recommended that the Railway Company be permitted to abandon its branch line of railroad between Scribner and Newman Grove, Nebraska, and that it not be permitted to abandon its branch line of railroad between Oakdale and Newman Grove, Nebraska.

The Commission, Division 4, after oral argument entered an order affirming and adopting the rulings, findings and conclusions of the Hearing Examiner.

The Protestants filed a Petition for Reconsideration and Reargument.

At a General Session of the Commission it was ordered that the Petition

for Reconsideration and Reargument of the Protestants be denied. No request was made to reopen the proceedings for the purpose of offering further evidence or for additional relief.

Plaintiff, Creston Grain and Lumber, Inc. filed its Complaint in this action on October 3, 1961, alleging, inter alia, that its principal place of business which is in Creston, Nebraska, is adjacent to the line of railroad, the abandonment of which is the subject of this litigation, that it was a member of an association which appeared as a protestant in the abandonment proceedings before the Commission, that the orders of the Commission are arbitrary and capricious, that the findings and conclusions of the Commission are unsupported by substantial evidence, that the Commission erred in considering the applicant's evidence offered to support the abandonment of a portion of the branch line in the absence of due notice to the protestants of the consideration of such issues, and that the Commission erred in considering certain "rebuttal evidence".

On October 16, 1961 the State of Nebraska ex rel. Nebraska State Railway Commission intervened herein pursuant to Title 28 U.S.C. § 2323, and adopted the allegations and prayer of the Complaint of Plaintiff, Creston Grain & Lumber, Inc.

The Court granted the following parties the right to intervene: Interstate Commerce Commission; Farmers Cooperative Elevator of Lindsay, Nebraska; Farmer's Co-op Mercantile Company of Leigh, Nebraska; Farmers Union Co-op Supply Company of Clarkson, Nebraska; Misek Lumber and Grain Company of Dodge, Nebraska, and Farmer's Union Co-op Grain Company of Synder, Nebraska.

Three questions are now before the Court, viz.,

1) Was the Commission guilty of unfairness in considering the issue of partial abandonment?

2) Was the Commission entitled to receive rebuttal evidence?

3) Is the order finally adopted by the Commission within the Commission's lawful authority and is it based upon substantial evidence?

## CONSIDERATION OF PARTIAL ABANDONMENT

Plaintiff maintains that the abandonment of part of this branch line involves totally different questions than does the abandonment of all of the branch line, that they had no opportunity to prepare for the presentation of evidence specifically directed at the question of abandonment of the Scribner-Newman Grove segment of this branch, or to prepare for cross-examination of applicant's witnesses on this point, that nothing in the pleadings and nothing in any of the previous testimony, briefs, Proposed Report or Report of the Commission indicates that consideration had been given to an abandonment of a portion of this branch line, and that the hearing, was therefore, as to the plaintiffs, clearly inadequate.

It should be noted here that, although Protestants (i. e. Plaintiffs) excepted to the Examiner's Proposed Report and later petitioned for reconsideration by and reargument before the full Commission of the report and order of Division 4, we have been unable to find in either of these actions any request by the Protestants that the Commission reopen the proceedings for the purpose of further cross-examination or for introduction of evidence on the part of Protestants as distinguished from a request for the Commission to reconsider its ruling based upon the evidence in the record and the order previously entered.

We note too that the plaintiffs agree that "Liberality in the admissibility of evidence has been the practice of the Interstate Commerce Commission. In fact, the advisability of applying the rules of evidence liberally has become an axiom of administrative practice, accepted rather uncritically by all. * * "

■ As the Commission held, on an application for a certificate of public convenience and necessity under the Act to

make abandonment of a railroad line, the statute clearly authorizes it to grant only partial relief, if the public interest so requires. Thus, the question of partial abandonment is one which is implicit in such an application, and one which the parties are bound to anticipate, unless the record shows such a misleading in respect to the particular situation as to make it unfair for the Commission to take such action on the hearing which has been had.

Title 49 U.S.Code § 1(20), provides in part,

"The Commission shall have power to issue such certificate as prayed for, or to refuse to issue it, or to issue it for a portion or portions of a line of railroad, or extension thereof, described in the application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. * * * *"

■■ We find nothing which made it unfair for the Commission to take such action in the circumstances of the present situation. Evidence was presented on behalf of the Railway Company which indicated substantial distinctions between the eastern and the western segments of the line involved. These differences could hardly altogether escape protestants' attention, and they could ordinarily be expected to anticipate the possibility that the Commission might see fit to deal with the significance of this in the public interest. If they did not so anticipate, they owed the duty of demonstrating to the Commission in the first instance that they were unfairly caught off-guard and of requesting that the question be reopened for further hearing, with a showing of what they desired to present or develop. No naked unfairness can be asserted here in the Commission's taking action within the bounds of what the evidence would warrant and as to which it felt called upon to exercise its responsibility in the public interest under the statutory power to grant only part of the abandonment sought. See and compare Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 439–440, 50 S.Ct. 220, 224–225, 74 L.Ed. 524 (1930) wherein the Court stated,

"Third. The claim that the order is void for lack of proper notice, insofar as it reduces charges below Tariff No. 1, is unsupported. The contention is that the notice of the hearings before the Examiner and the Secretary did not apprise plaintiffs of the Secretary's intention to fix a new schedule, but led them to believe that the hearings would be confined to the inquiry whether Tariff No. 2 was excessive and that, if it was found to be so, Tariff No. 1 would be left in force; whereas the tariff prescribed by the Secretary carries rates lower than Tariff No. 1. The notice given by the Secretary was neither defective nor misleading. It informed the plaintiffs that a hearing would be had under Title III of the Act. It apprised them that they would have 'the right to appear and show cause why a further order in respect to the said schedule of rates and charges should not be made' pursuant to Title III. Section 306(e) of that title provides that upon such a hearing the Secretary may make any order with reference to the proposed schedule which he could make in a proceeding initiated after the schedule had become effective. And § 310 of the same title expressly empowers the Secretary in any such proceeding, to fix the just and reasonable rate to be charged in the future, without limiting him to a determination of the lawfulness of a proposed rate. The plaintiffs should have anticipated, therefore, that the Secretary would fix a new rate, if the evidence before him would lead him to believe that such a course was proper and desirable."

We conclude that plaintiff's objection to the consideration of the issue of partial

abandonment is without merit, and that the Commission was not guilty of unfairness in considering this issue.

## CONSIDERATION OF REBUTTAL EVIDENCE

As we have previously seen, the Commission ordered a further hearing on May 2, 1960, for receiving evidence as to the results of operations of the line in 1959, and, upon protestants' motion of April 22, 1960, the Commission, on April 28, 1960, ordered that the protestants be allowed to present evidence as to unsatisfactory service at the hearing of May 2, 1960. The Commission's order recited that the applicants appeared to have no objection to the protestants being afforded this opportunity.

During the presentation of his evidence-in-chief, applicant's counsel, Mr. Hillman, informed the Hearing Examiner that he was not advised until that morning (May 2, 1960) that the Commission had opened the record somewhat and it might be that applicant would have rebuttal witnesses. At the completion of applicant's direct presentation of evidence, Mr. Hillman stated,

"* * * If Mr. Dalton has evidence to submit, we may have rebuttal evidence."

To this the Hearing Examiner replied,

"We'll face that when we come to it. I don't deny that you will have the right to cross-examine, but what type of rebuttal evidence you have in mind, we'll have to face that when we come to it."

During the presentation of protestants' evidence Mr. Hillman objected to a question "on the grounds that it does not seem in any way to relate to any developments on this line during 1959." The Hearing Examiner stated that he could see nothing in the order that would confine protestants to 1959, and overruled Mr. Hillman's objection.

At the close of the presentation of protestants' evidence, their counsel advised the Hearing Examiner that they had no further evidence and anticipated none, "unless there should be further evidence put in that might require rebuttal."

Following this, the Hearing Examiner expressed the tentative opinion that rebuttal evidence by the applicant would go beyond the scope of the Commission's orders in the proceeding, and that if the applicant desired to present such evidence, it should have filed a petition requesting such an opportunity. However, before finally ruling upon the matter, he asked counsel for both parties to express their views in the matter. After hearing the expression of counsel, the Hearing Examiner permitted the applicant to present rebuttal evidence.

At page 27 of the Brief of Protestants (following Hearing May 2 and 3, 1960) we find the following statement,

"What has happened here is obvious. Applicant, knowing that the question of service to the branch line was to be an issue at this hearing, reserved its witnesses on the point to be offered in 'rebuttal'. In fact, these witnesses did not rebut any evidence offered by the Protestants, but fortified Protestant's testimony. The testimony of the witness Coover as to derailments, and the exhibit relative to derailments, No. H–66 (Tr. 223–224) do not rebut Protestants' testimony that service on the branch line was poor in 1959, but merely explained some of the operating expenses which applicant placed in the record through the witness Abbott, Applicant's only witness in chief. Further, testimony of precisely this same nature was offered by the same witness as part of the Applicant's case in chief at the hearing in September of 1958 (Tr. 936, line 12, to tr. 937, line 10; Exhibit H–24)."

This Brief of Protestants has been attached to and made a part of the Brief of the Plaintiffs and Intervenors. Therefore, the Plaintiffs, having asserted that the rebuttal witnesses fortified Protestants' testimony, may not now be

heard to complain that the evidence received was prejudicial.

We conclude that the reception of the rebuttal evidence was proper.

The question of whether the Commission properly considered and ruled upon "partial abandonment" and the question of whether the Commission properly considered "rebuttal evidence" are elements of the broader question of whether plaintiffs had a fair hearing.

■ New York Central & H. R. R. Co. v. Interstate Commerce Commission (C.C.S.D., N.Y., 1909), 168 F. 131, would indicate that strict rules of pleading have long been disregarded so far as judicial review of orders of the Interstate Commerce Commission is concerned.

In that case the milling company objected to the validity of the order on the theory that it was not confined to the issues raised by the pleadings. The court said:

"If this order were a judgment of a court, we should without hesitation say that the facts alleged in the petition did not support it. The Interstate Commerce Commission is, however, an administrative tribunal dealing with practical problems. So long as parties affected by its orders appear and are fully heard, we think it would be most unfortunate to deny its power to grant such relief as the facts shown upon the investigation should call for, even though such facts might be presented by evidence technically outside the issues raised. Notwithstanding, therefore, that the commission has established rules of practice analogous to those in courts, notwithstanding that its rules even provide that hearing shall be had upon issue joined, we are of the opinion that the strict rules of pleading should not be held applicable to it. Before we declare an order of the commission invalid as being outside the issues, we think that we should be satisfied that it is outside the issues actually presented to the commission and upon which the parties were heard."

The court directed its attention to whether, as the hearing progressed, its scope widened and whether the real question before the Commission was in the minds of all the parties by the time all the evidence was received. On page 139, it was held:

"We have, therefore, thought it our duty to examine the evidence and consider the claims of the parties made upon the hearing before the commission. Through such examination we find that the milling company and the carriers appeared before the commission, and that the various phases of the discriminations claimed to exist against the milling company were fully inquired into, including that claimed to exist in favor of interior millers enjoying the milling in transit privilege. As the hearing progressed, its scope apparently widened, and at its conclusion we are satisfied that the real question before the commission in the minds of all the parties was whether it was proper and practicable to afford relief like that granted by the order. Indeed, we have no doubt that should we declare this order invalid, and a new petition should be filed, the inquiry would be along the lines of the hearing already had, with, presumably, the same result. We conclude, therefore, that, while the order may have been technically outside the issues raised by the pleadings, it was still germane to the subject-matter before the commission, and should not be declared invalid."

See also Civil Aeronautics Board v. State Air Lines, 338 U.S. 572, 70 S.Ct. 379, 94 L.Ed. 353 (1949). That case involved the allocation of air line routes in the Southeastern States. Piedmont Air Lines was awarded a line for which it had not even applied. State Air Lines, Inc. sought to reverse the Board on the ground, among others, "that since Pied-

mont had filed no application for the particular routes certified, State failed to have sufficient notice that the Board might consider Piedmont as a competing applicant, and thus was deprived of a fair opportunity to discredit Piedmont's fitness and ability to serve those routes."

State also argued that because it had never considered Piedmont as a possible applicant for the route awarded to it, "it failed to produce available evidence and arguments to convince the Board that Piedmont was not fit and able to serve as a carrier on the routes."

The Supreme Court recognized that the challenge was substantial but held that on the basis of the entire record "[i]t seems plain to us * * * that State did fully recognize that Piedmont was a potential competitive applicant" and pointed out that each argued against the other before the Board.

State also argued that "had it known Piedmont to be an actual competitor, State would have made diligent efforts by cross-examination and otherwise to prevent the Board's finding that Piedmont's qualifications were superior to State's".

The Board refused to reopen the hearing because of State's failure to specify what the nature of its additional evidence may have been and how it would have cross-examined any differently than it had in fact cross-examined.

█ It appears that our case involves much the same proposition and that plaintiff in our case has failed to make clear to either the Interstate Commerce Commission or to us the nature of its claimed prejudice on either the partial abandonment argument or on its rebuttal evidence argument.

The Court stated, at page 579, 70 S.Ct. at page 383,

"With particular reference to the general contention that in reopened proceedings State could offer evidence to refute the Board's findings of Piedmont's superior qualification, the Board said: 'Although in the course of the subsequent argument State asserted that had it been aware of the situation it might have presented additional or different evidence and would have enlarged upon its inquiries into Piedmont's case, it did not, in the course of the argument or in its petition for reconsideration, specify what the nature of such additional evidence or inquiries would have been.' Id., at 721. It was in this setting that the Board held State's showing inadequate to justify new hearings concerning the respective qualifications of State and Piedmont."

## CONSIDERATION OF THE EVIDENCE

█ We now reach the matter of whether the Commission properly found the facts and determined the question, in the exercise of a reasonable judgment. Chesapeake & Ohio Ry. v. United States, 283 U.S. 35, 42, 51 S.Ct. 337, 75 L.Ed. 824 [1913]. We conclude that it did, and we mention factors which point to the rationality of the Commission's decision:

All stations on the portion of the line to be abandoned are accessible by all-weather highways and have available service by motor carriers. The entire line was in poor condition, but the Eastern portion was in worse condition than the Western portion, as exemplified by the fact that 15 of 16 de-railments in 1959 occurred East of Newman Grove. Rehabilitation of the line would necessitate a considerable expenditure. Although the Scribner Newman Grove segment of the line covers a larger territory than does the Newman Grove-Oakdale segment of the line, the Scribner-Newman Grove segment produced less grain tonnage than did the Newman Grove-Oakdale segment of the line during the years 1958 and 1959. Although the Eastern portion of the line had a deficit for the years 1958 and 1959, the Western portion of the line made a substantial profit for both of these years. All of the towns on the abandoned line are a distance of no more than about 21 miles

from either the main line of the defendant Railway Company or a line of the Union Pacific Railroad Company, and arrangement for combined truck and rail service would appear to be feasible.

■ We are satisfied that the Commission properly balanced the public and private interests and arrived at a reasonable conclusion. In any event we must keep in mind, of course, that we may not substitute our judgment for that of the Commission if there is warrant in law and the facts for what the Commission has done.

As was stated in United States v. Pierce Auto Freight Lines, 327 U.S. 515, at 535, 66 S.Ct. 687, at 698, 90 L.Ed. 821:

"We think the court misconceived not only the effects of the Commission's action in these cases but also its own function. It is not true, as the opinion stated, that '* * * the courts must in a litigated case, be the arbiters of the paramount public interest.' This is rather the business of the Commission, made such by the very terms of the statute. The function of the reviewing court is much more restricted. It is limited to ascertaining whether there is warrant in the law and the facts for what the Commission has done. Unless in some specific respect there has been prejudicial departure from requirements of the law or abuse of the Commission's discretion, the reviewing court is without authority to intervene. It cannot substitute its own view concerning what should be done, whether with reference to competitive considerations or others, for the Commission's judgment upon matters committed to its determination, if that has support in the record and the applicable law."

This Memorandum shall constitute the Court's findings of fact and conclusions of law, as provided by rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.

Judgment will be entered dismissing the complaint.