**STATE OF NEBRASKA ex rel. NEBRASKA STATE RAILWAY COMMISSION, Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**

and

**Chicago and North Western Railway Company, Intervening Defendant,**

and

**Bloomfield Hatchery and Feed Mill, Inc., Carhart Lumber Company, doing business in Bloomfield, Nebraska, as Bloomfield Lumber Company, Holmquist Grain and Lumber Company of Bloomfield, Nebraska, Farmers Coop Elevator Company, of Bloomfield, Nebraska, Brockman Ready-Mix, Inc., of Bloomfield, Nebraska, Intervening Plaintiffs.**

Civ. A. 1020L.

United States District Court
D. Nebraska.
June 17, 1966.

Wallace M. Rudolph, Sp. Asst. Atty. Gen. of Nebraska, Lincoln, Neb., for plaintiff.

Manny H. Smith, Washington, D. C., for defendants United States and Interstate Commerce Commission.

Stuart F. Gassner, Louis T. Duerinck, Chicago, Ill., and Michael T. Levy, Omaha, Neb., for intervening defendant, Chicago & N. W. Ry. Co.

Wallace M. Rudolph, Lincoln, Neb., for intervening plaintiffs Bloomfield Hatchery and Feed Mill, Inc. and others.

Before JOHNSEN, Circuit Judge, and ROBINSON and VAN PELT, District Judges.

## MEMORANDUM OPINION

VAN PELT, District Judge.

This is an action, pursuant to 28 U.S.C.A. §§ 2321–2325 and 28 U.S.C.A. § 2284, to set aside, vacate and annul an order of the Interstate Commerce Commission, dated June 24, 1965, in its Finance Docket 22661 permitting abandonment by the Chicago and North Western Railway Company of rail lines and operations. The order granted North Western a certificate of public convenience and necessity authorizing abandonment of (a) a line between Bloomfield and Randolph, Nebraska, a distance of 22.47 miles; and (b) operations under trackage rights over the line between Randolph and Laurel, Nebraska, a distance of 14.54 miles. As the Burlington Railroad owns and operates over the latter line, this portion of the order is not seriously contested.

The administrative proceedings, pursuant to 49 U.S.C.A. § 1(18), began on June 17, 1963 with North Western filing its application with the Commission for authority to abandon the above described lines and service. Notice was served upon the Governor of the State of Nebraska and the Nebraska Railway Commission on June 25, 1963. Hearings were held on October 23 and 24 at Norfolk, Nebraska. By a report and order served on January 9, 1964, the Examiner recommended that a certificate be issued, permitting the abandonment as requested by North Western.

Protestant, State of Nebraska Ex Rel Nebraska State Railway Commission, filed exceptions to the Examiner's report on February 9, 1964, to which North Western replied on March 1, 1964. In its exceptions, protestant, in essence, claimed only that the Examiner did not give proper weight to the economic effect the abandonment would have upon the communities along the line and that North Western, by consolidation of agency forces, could reduce operating expenses. The Finance Review Board, while affirming the conclusion that abandonment was justified, limited the authorization as to the Bloomfield-Randolph line to the abandonment of operations, not the physical abandonment of the line. The basis for the latter conclusion was that the owner-lessor of the Bloomfield-Randolph line, Chicago, St. P., M. & O. Ry. Co. (Omaha), was not a party to the proceedings. However, upon consideration by Division 3 of the Commission, 324 I.C.C. 405, the decision of the Examiner was upheld as to both lines, the Commission holding that the absence of Omaha did not deprive the Commission of its jurisdiction to authorize complete physical abandonment.

Protestant then petitioned Division 3 for reconsideration, which was denied on November 10, 1965. A petition for review by the full Commission was denied on December 10, 1965, thereby exhausting administrative remedies. See State of Arizona v. United States, 220 F.Supp. 337 (D.Ariz.1963). On January 14, 1966, the protestant filed the instant action. On January 21, 1966, the court allowed North Western to intervene as a party defendant. The court on May 6, 1966 allowed the following parties to intervene as plaintiffs: Bloomfield Hatchery and Feed Mill, Inc. of Bloomfield, Nebraska; Carhart Lumber Company, doing business in Bloomfield, Nebraska as Bloomfield Lumber Company; Holmquist Grain and Lumber Company of Bloomfield, Nebraska; Farmers Coop Elevator Company of Bloomfield, Nebraska; and Brockman Ready-Mix, Inc. of Bloomfield, Nebraska.

The case was argued and submitted to the three-judge court on April 15, 1966. In deciding this case, the court is cognizant of its scope of judicial review as provided in 5 U.S.C.A. § 1009, commonly known as § 10(e) of the Administrative Procedure Act. The United

States Supreme Court in United States v. Pierce Auto Freight Lines, 327 U.S. 515, 536, 66 S.Ct. 687, 698, 90 L.Ed. 821, described the courts' function in these words:

> "The function of the reviewing court is much more restricted. It is limited to ascertaining whether there is warrant in the law and the facts for what the Commission has done. Unless in some specific respect there has been prejudicial departure from requirements of the law or abuse of the Commission's discretion, the reviewing court is without authority to intervene."

When a Commission order lies within the scope of its statutory authority and based upon adequate findings which are supported by substantial evidence, it may not be set aside by a reviewing court, even if the court would have reached a different conclusion. See I. C. C. v. Union Pac. R. Co., 222 U.S. 541, 32 S. Ct. 108, 56 L.Ed. 308 (1912); Creston Grain & Lumber Co. Inc. v. United States, 214 F.Supp. 840 (D.Neb.1963).

Protestant initially contends that the Commission failed to consider all the proper elements or factors necessary in determining the public convenience and necessity in abandonment proceedings. Those elements are: (a) the economic effect of the abandonment upon the total community and not upon the affected protestant shippers alone; (b) the applicant railroad's general policy of abandoning branch lines; and (c) the applicant railroad's ability to absorb the losses. Coupled with this is the feasibility of adopting procedures to reduce losses.

In considering these factors, protestant contends first, that the Commission has the burden of investigating the effects of the abandonment upon the community and the validity of the claims of the parties, or, in the alternative, that North Western has the burden to prove absence of economic harm to the community. Second, protestant asserts that the record does not reasonably support the Commission's decision that abandonment was in the public interest.

Before examining protestant's individual contentions in detail, a brief and general commentary should be made concerning the Commission's authority and function in cases such as this. 49 U.S.C.A. §§ 1(18)–1(20) enumerates the Commission's function in an abandonment proceeding. Section 1(18), the relevant section here, confers upon the Commission exclusive jurisdiction to permit abandonment of branch lines whose operation and maintenance impose an undue burden on interstate commerce. The purpose of the section is to promote efficient and sound rail transportation. The Commission's function, in essence, is the balancing of the immediate and local interest of the community and the shippers against the broader public interest in freeing interstate commerce from undue burdens. Justice Brandeis described that function in this manner:

> "The sole test prescribed is that abandonment be consistent with public necessity and convenience. * * * The benefit to one [intrastate v. interstate commerce] * * * must be weighed against the inconvenience and loss to which the other will thereby be subjected. Conversely, the benefits to particular communities and commerce of continued operation must be weighed against the burden thereby imposed upon other commerce. * * * The result of this weighing—the judgment of the Commission—is expressed by its order granting or denying the certificate." State of Colorado v. United States, 271 U.S. 153, 168, 46 S. Ct. 452, 456, 70 L.Ed. 878.

In most, if not all, abandonment proceedings, the interests are in conflict. The railroad desires to cease operation usually because the line is unprofitable. The shippers and the affected communities desire retention of the existing rail service even though seldom used. Weighing these conflicts, the Commission determines the "public convenience and necessity."

In examining the record, we find that for several years the railroad had been absorbing losses in the operation of the line. More specifically, $10,851 in 1961, $23,133 in 1962, and $19,805 in the first eight months of 1963. Protestant does not challenge these figures. Several shippers testified and offered evidence as to the effect of the abandonment upon them. However, with few exceptions all testified as to the availability of other means of transportation which could satisfy their needs without much inconvenience or additional cost. The record shows that all of the affected communities are served by all-weather highways; that truck service is not only available but is also substantially used; that use of the rail service has steadily declined; and that no shipper was completely dependent upon the rail service.

There is no doubt that some inconvenience and financial loss will result from the abandonment, but, this is only one aspect to be considered in the balancing process and is not controlling. If railroad abandonment had to depend upon proof that the affected community would suffer no inconvenience or economic loss, we dare say that few lines, if any, would ever be abandoned. Such a requirement not only runs against the grain of logic and common sense but would result in undue burden on interstate commerce. Village of Candor v. United States, 151 F.Supp. 889 (D.N.Y. 1959); State of Colorado v. United States, supra.

■■ Protestant contends that "public convenience and necessity" includes the effect of the abandonment upon the "community" as a whole as distinguished from a group of "individual shippers." As the words "public convenience and necessity" are not defined in the statutes, the courts have allowed the Commission a wide range of discretion in determining their meaning. Southern Ry. Co. v. United States, 180 F.Supp. 189 (E.D.Va.1959). However, the court believes that the words import the inclusion of the "general public" as contrasted with any specific individual such as a protestant shipper. The general public, however, may be seen through individuals such as protestant shippers. See Chicago, R. I. & Pac. R. Co. v. United States, 205 F.Supp. 378 (N.D.Ill.1962). The effect upon the total community may be seen through the effect of the abandonment upon the individual shippers who serve the community.

Concerning the ability of North Western to absorb the losses or to undertake money-saving procedures, the court first notes that protestants, before the Finance Board and Division 3 of the Commission, suggested the consolidation of agencies. The record, however, is completely void as to the feasibility of the consolidation or, if feasible, whether any significant savings would result therefrom.

As to requiring the Commission to examine the full financial condition of North Western, the court believes the following to be applicable.

"This Court has long recognized that the Commission may properly give varying weights to the overall prosperity of the carrier in differing situations. Thus, in [State of] Colorado v. United States, 271 U.S. 153 [46 S.Ct. 452, 70 L.Ed. 878], which also involved a situation in which the Commission was required to balance public convenience and necessity against undue burdens on interstate commerce, it was specifically noted that 'In many cases, it is clear that the extent of the whole traffic, the degree of dependence of the communities directly affected upon the particular means of transportation, and other attendant conditions, are such that the carrier may not justly be required to continue to bear the financial loss necessarily entailed by operation. In some cases * * * the question is whether abandonment may justly be permitted, in view of the fact that it would subject the communities directly affected to serious injury while continued operation would impose a relatively light burden upon a prosperous carrier.' 271 U.S., at 168–169 [46 S.Ct. at 456]. In cases

falling within the latter category, such as those involving vital commuter services in large metropolitan areas where the demands of public convenience and necessity are large, it is of course obvious that the Commission would err if it did not give great weight to the ability of the carrier to absorb even large deficits resulting from such services. *But where, as here, the Commission's findings make clear that the demands of public convenience and necessity are slight and that the situation is, therefore, one falling within the first category delineated in Colorado, it is equally proper for the Commission, in determining the existence of the burden on interstate commerce, to give little weight to the factor of the carrier's overall prosperity."* Southern R. Co. v. North Carolina, 376 U.S. 93, 104–105, 84 S.Ct. 564, 571, 11 L.Ed.2d 541 (1964). (Emphasis added.) See also Northwestern Pacific R. R. Co. v. United States, 228 F.Supp. 690 (N.D.Cal.1964), affirmed, 379 U.S. 132, 85 S.Ct. 274, 13 L.Ed.2d 333, rehearing denied 379 U.S. 984, 85 S.Ct. 641, 13 L.Ed.2d 577.

■ This court concludes, as did the Commission, that the demands of public convenience and necessity in this case are slight and that little weight should be given to the carrier's financial ability to absorb the line's losses. The Commission stated:

"It is therefore evident that the considered line would still be operated at substantial deficits. Moreover, there are adequate highway facilities in this area and frequently shippers resort to public and private motor carriers. In these circumstances, the aforesaid deficit operations coupled with the absence of shipper dependence upon the considered line, warrant the conclusion that present and future public convenience and necessity does not require continued operation of the line and that such a continuance would be an unnecessary burden on the applicant and on interstate commerce." 324 I.C.C. 405, 409.

■ Protestant also asserts that the Commission has to consider the applicant Railroad's general policy of abandoning branch lines. Such a consideration, the court believes, is not only irrelevant but also is contrary to statutory language and its purposes. First, the Railroad's policy on abandonment, even if existent, would be of no effect as the Commission is the sole authority in allowing the abandonment of a particular line. Section 1(18) provides, so far as pertinent here:

"* * * [N]o carrier by railroad subject to this part shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment."

Second, each abandonment case must be examined by the Commission on an individual basis. Whether a particular line is abandoned can not be based or even influenced by a consideration of the Railroad's abandonment policy or by a consideration of whether the Commission has previously allowed the abandonment of another line of the same Railroad company. Both logic and the statutes require this. The sole test is whether the abandonment is consistent with public convenience and necessity. Burke County, Georgia v. United States, 206 F. Supp. 586 (D.C.Ga.1962).

■ After a complete review of the record, the court concludes that the Commission properly balanced the public and private interests and arrived at a reasonable conclusion.

In view of the losses unquestionably sustained in the operation of the lines and the expenses required to sustain operation, and the other available means of transportation, it cannot be said that the order of the Commission was without proper support in the findings of the evidence. Whether the prospective loss to the public and shippers from discontinuance of the line was sufficient to counter-balance the loss to the Railroad

Company and the burden on interstate commerce which would result from its continued operation is a matter which Congress has committed to the judgment of the Commission.

Judgment will be entered dismissing the complaint.